**Electronically Filed
Intermediate Court of Appeals
29994
30-MAR-2011
08:02 AM**

NO. 29994

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellant, v.
TALELE MIKA, Defendant-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 08-1-0053)

MEMORANDUM OPINION
(By: Leonard and Reifurth, JJ., and Foley,
Presiding Judge, concurring separately)

Defendant-Appellant Talele Mika ("Mika") appeals from
the September 23, 2009 Judgment of Conviction and Sentence
("Judgment") of the Circuit Court of the First Circuit ("Circuit
Court")[1] convicting him of Promoting a Dangerous Drug in the
Third Degree under section 712-1243[2] of the Hawaii Revised
Statutes ("HRS") and Unlawful Use of Drug Paraphernalia under HRS
§ 329-43.5[3], and sentencing him to five years in prison.  Mika
contends that the Circuit Court erred by: (1) failing to instruct

---

[1]    The Honorable Dexter D. Del Rosario presided.

[2]        Promoting a dangerous drug in the third degree.  (1) A
       person commits the offense of promoting a dangerous drugs in the
       third degree if the person knowingly possesses any dangerous drug
       in any amount.

HAW. REV. STAT. § 712-1243(1) (Supp. 2010).

[3]        Prohibited acts related to drug paraphernalia.  (a) It is
       unlawful for any person to use, or to possess with intent to use,
       drug paraphernalia to plant, propagate, cultivate, grow, harvest,
       manufacture, compound, convert, produce, process, prepare, test,
       analyze, pack, repack, store, contain, conceal, inject, ingest,
       inhale, or otherwise introduce into the human body a controlled
       substance in violation of this chapter.  Any person who violates
       this section is guilty of a class C felony . . . .

HAW. REV. STAT. § 329-43.5(a) (2010).

the jury on the defense of mistake of fact; and (2) failing to suppress the post-arrest evidence against Mika as the fruit of an unlawful seizure.

We reverse.

I.    BACKGROUND

Honolulu Police Department ("HPD") Detective Kongton Sitachitta was assigned to investigate a burglary that occurred on January 2, 2008 in Village Park, Oahu.  Because a neighbor of the victim identified Mika's vehicle as being involved in the burglary, Detective Sitachitta asked Mika to come down to the police station to discuss his whereabouts, his car, and who was driving his car at the time of the burglary.  When another suspect identified Mika as the get-away driver for the burglary, Detective Sitachitta asked the HPD plain clothes unit to find Mika and ask him to come in to the police station again.  At the time, Detective Sitachitta did not believe that he "had enough" to arrest Mika for burglary.

Officer Duane Webster testified that he was asked to obtain Mika's voluntary presence at the police station for questioning regarding a burglary.  On January 10, 2008, the officers of the Crime Reduction Unit ("CRU officers") asked Mika's brother for assistance, and a meeting between Mika and his brother was arranged at the local 7-Eleven.  The CRU officers went to the 7-Eleven to wait for Mika.

Mika testified that on January 10, 2008, his brother called him in a panic and asked him to meet at 7-Eleven.  On the way, Mika heard something rattling inside the passenger door panel of his vehicle and found a methamphetamine pipe, which he believed belonged to his brother.  Intending to confront his brother about it, Mika placed the pipe in his pocket.  When Mika arrived at the 7-Eleven, his brother told him that he wanted cigarettes, so Mika went inside the store to purchase cigarettes for his brother and minutes for his cell phone.

When Mika arrived, eight CRU officers dressed in plain clothes and wearing body armor with the word "police" written across the front and back were waiting for him.  They were carrying firearms and badges, and were using unmarked vehicles.

2

When Mika entered the 7-Eleven, four of the CRU officers followed, approached Mika, and identified themselves.[4] Officer Webster testified, "I asked [Mika] for his identification to verify who he was and took down his information. The other officers talked to him and told him that we were looking for him to come in voluntarily."

Officer Webster did not inform Mika that he had the right to remain silent or the right to an attorney. Officer Webster testified that the other CRU officers told Mika that Detective Sitachitta wanted to talk to him about the burglary. Mika was calm and cooperative, and agreed to go to the police station.

Mika was driven to the police station by the CRU officers in their unmarked vehicle. Officer Webster's sergeant requested Mika's permission to drive Mika's car to the station, and Mika agreed.[5] The CRU officers did not obtain a consent form from Mika providing that he was voluntarily going to the police station and letting the police drive his car.

The CRU officers did not speak with Mika about the case during the ride. The CRU officers did not ask Mika any questions other than to find out if he was willing to go with them. During the encounter, the CRU officers did not threaten Mika or make any threatening gestures, place him in handcuffs, or put their hands on him. Officer Webster denied that the CRU officers frisked or searched Mika outside the 7-Eleven.[6]

Mika testified that he was willing to go to the police station. It is unclear from the context of the question or the

---

[4] According to Mika, the CRU officers surrounded him inside the store, "and [looked] like they was going to arrest me."

[5] To the contrary, Mika said that he told the CRU officers that he would follow them to the station in his car, but one of the officers said "we cannot let you drive your car." The CRU officers then told Mika that if he did not give them permission to drive his vehicle, they would have it towed to the station. Mika offered to have his brother drive the car, but the CRU officers said no. Believing that he had no choice, Mika told the officers to "go right ahead."

[6] To the contrary again, Mika testified that the CRU officers pat searched him outside the 7-Eleven "to see if I had any weapons. They grabbed me by the arm. One grabbed me by the arm and one did the pat search."

3

answer, however, whether Mika's self-described willingness was dictated by the presence of eight armed police officers dressed in body armor. At the station, Detective Sitachitta informed Mika of his rights, and told Mika that he had the right to remain silent and to have an attorney present. Mika appeared to understand, and told Detective Sitachitta that he understood. Mika signed the form indicating that he understood and was waiving his rights.

Mika reiterated that he had not been involved with the burglary. After Detective Sitachitta told him that they had a suspect under arrest who was telling a different story, however, Mika conceded that he played a role in the burglary. Mika admitted that he had parked near the Victim's house and waited for his brother, Pasion, and Hoopai to return. Mika knew when he parked his car that the others were planning to burglarize the house, and, when they returned, he drove them away. In return for driving, Mika was given some of the stolen property.

Mika was arrested for his part in the burglary. During the arrest, the police recovered the methamphetamine pipe from Mika's pocket. Later that evening, Mika was arrested again and charged with Promoting a Dangerous Drug III and Unlawful Use of Drug Paraphernalia.

On October 31, 2008, Mika's counsel filed a Motion to Dismiss Felony Information and/or, in the alternative Motion to Suppress Evidence ("Motion to Suppress"). The motion contended that the State lacked probable cause, that any statements from the January 5, 2008 interview should be suppressed because they were the product of custodial interrogation, and that any statements from the January 10, 2008 interview should be suppressed because Mika did not give a knowing and intelligent waiver of his rights due to his educational background, mental condition, the physical injuries that he had suffered, and the medication that he was taking.

At the January 21, 2009 hearing on the Motion to Suppress, Mika's counsel argued that Mika was seized without a warrant at the 7-Eleven. The State objected, noting that the issue of warrantless seizure had not been briefed or argued up to

that point, and requested additional time. The hearing was rescheduled for March 16, 2009, and the State was permitted to present additional testimony to address the newly-raised issue. Mika was allowed to testify on rebuttal. The State did not dispute Mika's argument that the State lacked probable cause to arrest Mika.

The Circuit Court denied the Motion to Suppress:

> As to the statement on January 10th, 2008, the Court finds the defendant was informed of his constitutional rights and made a knowing, intelligent and voluntary waiver of those rights.

> As to the issue regarding the vehicle, the Court is going to find that the defendant consented to his vehicle being driven by the police to the station and that he had voluntarily gone to the station with the police where he subsequently waived his constitutional rights and gave his statement. So the Court is going to deny the motion.

On April 2, 2009, the Circuit Court filed its Findings of Fact, Conclusions of Law and Order Denying Motion to Dismiss Felony Information and/or, in the Alternative Motion to Suppress Evidence, which stated in relevant part:

FINDINGS OF FACT

. . . .

8. On January 10, 2008, Detective Sitachitta directed members of the Honolulu Police Department's Crime Reduction Unit (hereinafter "CRU") to attempt to locate Defendant to see if he would come in to provide information on a burglary case under HPD Report No. 08-001981.

9. Officer's (sic) Duane Webster (hereinafter "Officer Webster"), Douglas Lee, Stuart Leong, and Seargeant Douglas Iwamasa (hereinafter "Sergeant Iwamasa") made checks in the Waipahu area and with the assistance of Defendant's brother, . . . arranged to meet with Defendant at the 7-Eleven located at 94-911 Farrignton (sic) Highway.

10. At approximately 7:00PM, Defendant voluntarily appeared at the 7-Eleven located at 94-911 Farrignton (sic) Highway and was approached by Officer Webster and two other officers.

11. After being informed of Detective Sitachitta's request, Defendant volunteered to come to the Pearl City Police Station for a second interview with Detective Sitachitta.

12. Defendant gave Sergeant Iwamasa permission to drive his vehicle to the Pearl City Police Station while he rode in the Officers' CRU vehicle.

. . . .

14.    Defendant provided further details to Det. Sitachitta about the burglary under HPD Report No. 08-001981 including what was given to him and [Pati] Mika by [Shannon] Hoopai and [Joseph] Pasion after they returned from the residence.  Defendant admitted that he knew that Shannon and [Joseph] intended to burglarize a house but he was afraid so he did not leave.

15.    During the January 10, 2008, interview, Defendant did not present any differently than he had during the January 5, 2008 interview; he was lucid and able to engage in conversation with Detective Sitachitta intelligently.

16.    Following the interview, Det. Sitachitta instructed Officer Stuart Leong to arrest Defendant for Burglary in the First Degree of the Hasegawa residence.

17.    During the pre-incarceration search of Defendant, a glass cylindrical pipe containing residue resembling methamphetamine was recovered. . . . .

CONCLUSIONS OF LAW

.   .   .   .

3.    The Hawaii Supreme Court (hereinafter "Supreme Court") has stated that whether a defendant's statement should be suppressed as the fruit of an unlawful warrantless seizure requires a two-part analysis: "(1) At what point, if at all, was the individual 'seized'; and (2) if so, whether, prior to the seizure, the individual voluntarily and intelligently consented."  State v. Kauhi, 86 Hawaii 195, 203 (1997).

4.    On January 10, 2008, Defendant voluntarily accompanied Officer Webster to the Pearl City Police Station for a second interview with Detective Sittachitta and willingly agreed to let Sergeant Iwamasa drive his vehicle to the station.

5.    Defendant was not "seized" prior to his January 10, 2008 interview with Detective Sitachitta and, even if he was, he voluntarily and intelligently consented prior to the seizure.

6.    Miranda, also sets out that a Defendant may waive his right to remain silent and be represented by an attorney during questioning by the police.  A waiver will be valid if it is made voluntarily, knowingly, and intelligently.  Miranda, supra, 384 U.S. [436, 444 (1966)]. See also State v. Green, 51 Haw. 260, 457 P.2d 505 (1969).

7.    Viewing the totality of the circumstances in which Defendant's statement was made it is clear that no violation of his constitutional rights occurred.  Defendant was lucid and able to engage in conversation intelligently, the detective informed Defendant of his constitutional rights with the aid of the HPD 81 form, and everything that police officers should do to ensure that Defendant understood his Miranda rights was done.

8.    Defendant knowingly, voluntarily and intelligently elected to waive his constitutional rights and Defendant's statements were freely and voluntarily given.

The case proceeded to trial and Mika was found guilty by the jury of Promoting a Dangerous Drug in the Third Degree and Unlawful use of Drug Paraphernalia.

II.  STANDARDS OF REVIEW

    A.  Findings Of Fact/Conclusions Of Law - Criminal

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard.  A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.  The circuit court's conclusions of law are reviewed under the right/wrong standard.

State v. Walker, 106 Hawai'i 1, 9, 100 P.3d 595, 603 (2004) (internal quotation marks and citations omitted) (quoting State v. Naititi, 104 Hawai'i 224, 233, 87 P.3d 893, 902 (2004)).  "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned."  Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994) (internal quotation marks and citation omitted).

Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."  State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (internal quotation marks and citation omitted).

    B.  Motion To Suppress

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard.  A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made.  The circuit court's conclusions of law are reviewed under the right/wrong standard.  Furthermore, . . . the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged.  The proponent of the motion to suppress must satisfy this burden of proof by a preponderance of the evidence.

State v. Balberdi, 90 Hawai'i 16, 20-21, 975 P.2d 773, 777-78 (App. 1999) (quoting State v. Anderson, 84 Hawai'i 462, 467, 935

P.2d 1007, 1012 (1997)).

Consequently, the appellate court reviews "the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was right or wrong." *State v. Eleneki*, 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004).

> [W]hen a defendant's motion to suppress evidence is denied prior to trial, the defendant need not object at trial to the introduction of the evidence to preserve his or her right to appeal the pretrial denial of his or her motion to suppress and the introduction of the evidence at trial.

*State v. Kong*, 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App. 1994). Further,

> [W]hen the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.

*Id.*

C.   Whether A Seizure Has Occurred

"[A] person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews *de novo*." *State v. Kearns*, 75 Haw. 558, 566, 867 P.2d 903, 907 (1994) (citations omitted).


III. DISCUSSION

Mika contends that the Circuit Court erred in (1) finding that he volunteered to go to the Pearl City Police Station to meet with Detective Sitachitta on January 10, 2008, and (2) concluding that (a) he was not seized prior to his interview that day with Detective Sitachitta and, even if he was, (b) he voluntarily and intelligently consented prior to the seizure. The State, on the other hand, contends that Mika was not seized, that he voluntarily went to the station, and that the Circuit Court's finding of voluntariness reflected the credibility of the witnesses and the weight of the evidence.

Whether the pipe and its contents should have been suppressed as the fruit of an unlawful warrantless seizure requires a two-part analysis: (1) at what point, if at all, was Mika seized; and (2) if he was seized, whether, prior to the seizure, he voluntarily and intelligently consented. *State v. Kauhi*, 86 Hawai'i 195, 203, 948 P.2d 1036, 1044 (1997). The first step is to determine whether a seizure, in the constitutional sense, has occurred. *Kearns*, 75 Haw. at 566, 867 P.2d at 907. The test is an objective one.

> [A] person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave. Whether a reasonable person would feel free to leave is determined under an objective standard that this court reviews *de novo*.

*Id.* (citations omitted).

On January 5, 2008, Detective Sitachitta questioned Mika about his possible involvement in the burglary. On January 10, 2008, Mika was again asked to go to the police station for further questioning.

> [W]hen the activities of law enforcement officials convey the impression that an investigation of specific and identifiable criminal activity has commenced and they have reason to believe that the citizen is involved or possesses relevant information, a reasonable person is more likely to believe that he or she is not free to ignore the official request and walk away.

*Kearns*, 75 Haw. at 567, 867 P.2d at 907. "A reasonable person feels a much stronger compulsion to cooperate with police when that person is the subject of the questioning than when the person is approached as a potential witness to the activities of others." *Kearns*, 75 Haw. at 568 n.4, 867 P.2d at 908 n.4.

In *Kearns*, the Hawai'i Supreme Court held that a seizure had occurred when a narcotics officer, who was investigating narcotics trafficking at the airport, stopped a passenger, identified himself as an officer, and asked to see the passenger's driver's license and airline ticket. Borrowing from Justice Brennan's concurring opinion in *Florida v. Royer*, 460 U.S. 491 (1983), the Hawai'i Supreme Court explained that:

> By identifying themselves and asking for the defendant's airline ticket and driver's license the officers, as a practical matter, engaged in a "show of authority" and "restrained the defendant's liberty." It is simply wrong to suggest that a traveler feels free to walk away when he has

> been approached by individuals who have identified
> themselves as police officers and asked for, and received,
> his airline ticket and driver's license.

*Kearns*, 75 Haw. at 568, 867 P.2d at 908 (citing *Florida v. Royer*, 460 U.S. 491, 511-12 (1983) (Brennan, J., concurring) (brackets omitted)). Therefore, "all evidence obtained as a result of the seizure should have been suppressed." *Id.* at 572, 867 P.2d at 909-10.

Not every police-initiated warrantless encounter amounts to an unlawful seizure. In *Kauhi*, 86 Hawai'i 195, 948 P.2d 1036, for instance, the Hawai'i Supreme Court found that there had not been an unlawful seizure when, following up on a tip potentially implicating the defendant, the police went to the defendant's home to ask him to go to the police station to speak with the detective. Only one officer went to the door while the other two remained in the police car, the officer told the defendant at least twice that he did not have to go to the police station, and the police did not ask the defendant any questions. The court held that an unlawful seizure had not occurred because, under the circumstances, a reasonable person would have felt free to leave or to simply return into the home. *Id.* at 203-04, 948 P.2d at 1044-45.

The police contact in this case is objectively more coercive than it was in either *Kearns* or *Kauhi*. The police enlisted Mika's brother to lure Mika to the 7-Eleven. While Mika was inside the store, ostensibly on his brother's business, four officers dressed in body armor with the word "police" written on the front and back, and carrying weapons, approached Mika. The officers identified themselves as police, and asked for Mika's identification.

Unlike the defendant in *Kauhi*, Mika was approached by four officers instead of one, the police did not tell him that he was free to leave, and he did not have the option of retreating into his home. As the officer did in *Kearns*, the officers engaged in a show of authority by identifying themselves as police, asking for identification, and explaining that they wished for the suspect to come down to police headquarters. We

conclude that, under the circumstances, a reasonable person would not have felt free to walk away, and that Mika was seized when the four CRU officers approached him, identified themselves, requested identification, and asked him to go to the station with them without promptly informing Mika that he did not have to cooperate.[1]/ The fact that Mika went with the officers, just moments after placing a methamphetamine pipe into his pocket, is tangible evidence of that perspective.

That conclusion does not end the analysis. The supreme court has recognized several exceptions to the warrant requirement of article I, section 7 of the Hawai'i Constitution in the context of seizures:

> the police may arrest an individual if they have probable cause to believe that the individual is committing or has committed an offense . . .; the police may temporarily detain an individual if they have a reasonable suspicion based on specific and articulable facts that criminal activity is afoot . . .; and the police may engage in an investigative encounter with an individual if the individual "consents."

*Kearns*, 75 Haw. at 569, 867 P.2d at 908 (footnote and citations omitted).

Detective Sitachitta testified that he did not have sufficient evidence at the time of the 7-Eleven confrontation to arrest Mika, and we determine no basis upon which the police might have determined that criminal activity was afoot. As a result, we focus our attention on whether Mika consented.

> Whether a person has "consented" to an investigative encounter-for the purpose of satisfying article I, section 7 of the Hawai'i Constitution . . . at the first level of analysis, a question of fact for the trial court to decide, involving a determination as to (1) whether the person was timely advised that he or she had the right to decline to participate in the encounter and could leave at any time, and (2) whether, thereafter, the person voluntarily participated in the encounter. Findings of fact are reviewed under the clearly erroneous standard. A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left "with the definite and firm conviction that a mistake has been committed."
>
> At the second level of analysis, we ask whether the facts as found amount to legally adequate "consent." "This

---

[1]/ Our conclusion does not reflect an evaluation of the witnesses' testimony, demeanor or credibility, on which we defer to the trier of fact. *State v. Mattiello*, 90 Hawai'i 255, 259, 978 P.2d 693, 697 (1999). Rather, we consider only the undisputed circumstances of the 7-Eleven encounter.

is a question of constitutional law, and we answer it by exercising our own independent constitutional judgment based on the facts of the case."

*State v. Trainor*, 83 Hawai'i 250, 255, 925 P.2d 818, 823 (1996) (citations and ellipses omitted) (holding that police had seized defendant when they questioned him in order to investigate him for a crime and had made him aware of that from the outset).

The consent exception "will rarely be applicable" because most seizures "occur at the inception of the interaction between the police and the individual" and because consent must be given prior to the seizure. *Kearns*, 75 Haw. at 570 n.5, 867 P.2d at 908 n.5. In considering whether consent to a search has been given, the Hawai'i Supreme Court has examined the following factors: (1) the number of officers present; (2) the degree to which they emphasize their authority; and (3) the display of weapons. *State v. Patterson*, 58 Haw. 462, 471, 571 P.2d 745, 751 (1977).

In *Kearns*, the court held that the defendant had not consented to his seizure by police. The court reasoned that prior to the time of his seizure, that is when the police asked him for his airline ticket and driver's license, the defendant had not been informed of his right to decline to participate in the encounter. Thus, the defendant could not have consented to the seizure. *Kearns*, 75 Haw. at 571-72, 867 P.2d at 909.

Similarly, in this case, Mika was not told that he could decline to participate or that he did not have to go to the station. Officer Webster testified, "I asked [Mika] for his identification to verify who he was and took down his information. The other officers talked to him and told him that we were looking for him to come in voluntarily." As in *Kearns*, there was no consent to the seizure. Furthermore, Mika was approached by four armed police officers dressed in body armor while four more waited in the parking lot. These factors weigh further in favor of finding that Mika did not voluntarily consent to the seizure.

Consequently, we conclude that Mika did not consent. As a result, we conclude that the Circuit Court clearly erred in

12

finding that Mika volunteered to meet with Detective Sitachitta on January 10, 2008, and further erred in concluding that Mika was not seized and/or consented to the seizure. Therefore, the Circuit Court erred as well in not granting the Motion to Suppress.

In light of our determination above, we need not address Mika's contention that the Circuit Court erred in not providing a mistake of fact instruction.

"[A]ssuming an unreasonable search or seizure, any evidence derived therefrom is inadmissible in a criminal prosecution, and a conviction obtained thereby must be reversed." *State v. Maldonado*, 108 Hawai'i 436, 445, 121 P.3d 901, 910 (2005) (internal quotation marks omitted) (quoting *State v. Wallace*, 80 Hawai'i 382, 393, 910 P.2d 695, 706 (1996)). As there was no evidence on which the Circuit Court could convict if the Motion to Suppress was granted, we reverse the September 23, 2009 Judgment of Conviction and Sentence entered in the Circuit Court of the First Circuit.

DATED: Honolulu, Hawai'i, March 30, 2011.

On the briefs:

Richard D. Gronna,
for Defendant-Appellant.

Brian R. Vincent,
Deputy Prosecuting Attorney,
City & County of Honolulu,
for Defendant-Appellee.

Associate Judge

Associate Judge